UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

**MEMORANDUM & ORDER**

In re
NIGERIA CHARTER FLIGHTS
CONTRACT LITIGATION

04 MD 1613 (RJD) (MDG)

-------------------------------------------------------X

In re
WORLD AIRWAYS LITIGATION

04 CV 0304 (RJD) (MDG)

-------------------------------------------------------X

DEARIE, Chief Judge.

Plaintiffs allege violations of the Warsaw and Montreal Conventions, as well as breach of

contract, fraud, and negligence, arising from the failure of World Airways, Inc. ("World") to

operate international flights for which plaintiffs had purchased tickets. On January 30, 2006, this

Court certified a class of plaintiffs who purchased tickets prior to January 31, 2004, for travel

between Nigeria and the United States, and whom World failed to transport as scheduled due to

its discontinuation of flight operations. Both World and plaintiffs have moved for summary

judgment. For the reasons explained below, World's motion is granted in part and denied in part,

and plaintiffs' motion is denied.


**BACKGROUND**

In December 2002, World entered into an agreement with Ritetime Aviation and Travel

Services, Inc. ("Ritetime") under which it agreed to supply Ritetime with charter air

transportation between New York, Atlanta, and Lagos, Nigeria for sale to the public. See

Costello Aff. Ex. 10 (World Airways Charter Aircraft Services Agreement) [hereinafter Charter Agreement]. The Charter Agreement obligated World to provide aircraft and flight support for eighty-three round-trip flights between February 28 and December 30, 2003, for which Ritetime was to pay World approximately $300,000 per flight. Id. Annex A. Forty-two of these flights were to operate between Atlanta and Lagos, and the remaining forty-one between New York and Lagos.[1] In a separate agreement, World granted Ritetime limited use of its trademarks for the purpose of marketing the flight program. See id. Ex. 11 (Trademark License Agreement).

Although the Charter Agreement provided only for flights in 2003, both parties contemplated that the Nigeria flight program would continue beyond the end of that year. See id. Ex. 46 (October 20, 2003 email from World executive to Ritetime consultant describing proposed schedule and pricing for the period January 1, 2003 to May 31, 2004); Monroe Aff. Ex. 55 (December 2, 2003 email from World ordering 10,000 blank tickets to be delivered to Ritetime Aviation). Ritetime sold tickets for travel in 2004, including those purchased by plaintiffs. At the same time, however, Ritetime fell behind in its payments to World, and by December 31, 2003, it owed World more than $2 million. Def.'s Rule 56.1 Stat't ¶ 38.

In late 2003, World warned Ritetime that it would not continue to participate in the Nigeria flight program unless Ritetime paid its debt, see Costello Aff. Ex. 44 (December 5, 2003 letter from World vice president to Ritetime C.E.O.), and declined to sign an amendment to the Charter Agreement extending the program, id. Ex. 43 (amendment). On or about December 28,

---

[1]The record indicates that the flight program also included a Houston-Lagos route, with Atlanta as an intermediate stop, see Costello Aff. Ex. 38 (list of flights operated by World Air for Ritetime between May 28, 2003 and December 31, 2003), but neither the Charter Agreement nor its Annex mentions the Houston flights, and these flights do not appear to figure into the total cost of the contract established by the Charter Agreement.

2003, World canceled a round-trip flight between New York and Lagos. Then, after operating a final flight on a triangular New York-Lagos-Atlanta route on December 30-31, 2003, Costello Aff. Ex. 38 (list of flights operated), World ceased operations between Nigeria and the United States, effectively terminating the flight program. As a result, hundreds of passengers who had purchased tickets for flights in 2004 were unable to travel. Some passengers, having flown the outbound legs of their round trips already, were stranded in airports far from home.[2]

On January 19, 2004, after "considerable discussion" with the DOT's Enforcement Office, World flew 318 passengers who had been stranded in Lagos back to New York. Costello Aff. Ex. 53 (DOT consent order) [hereinafter Consent Order] 3. World claims that it also paid for 20 passengers who were stranded in the United States to return to Lagos, Def.'s Rule 56.1 Stat't ¶ 58, and there is evidence that Ritetime paid to return some stranded passengers, as well, Costello Aff. Ex. 50 (Ritetime letter to DOT, Feb. 25, 2004). Named class representatives, however, had to arrange their own alternative transportation after being stranded.[3] Other

---

[2]The parties dispute the number of affected passengers. Plaintiffs offer the testimony of James E. Corter, an associate professor of statistics at Columbia University, whose analysis of data provided to him by plaintiffs' attorneys yielded the following estimates: 2,752 passengers who flew from the U.S. and were stranded in Nigeria; 1,999 passengers who flew from Nigeria and were stranded in the U.S.; 692 passengers who purchased flights in the U.S. but never flew; and 374 passengers who purchased flights in Nigeria but never flew. Monroe Aff. Ex. 73 (Corter Report) 1. In response, defendants point to the testimony of Ritetime consultant Jerry Murphy, who expressed the view at his deposition that approximately 500 passengers were stranded in New York, and anywhere from 120 to 600 in Lagos. Costello Aff. Ex. 87 (Murphy Dep.) 42. Defendants also offer the transcript of Professor Corter's deposition, which suggests that his estimates exceed the actual numbers of affected passengers. Id. Ex. 78. Meanwhile, a consent order issued by the U.S. Department of Transportation in the aftermath of World's decision to discontinue service (and discussed below) estimated the numbers of strandees at 1,221 in Lagos and 860 in New York. Id. Ex. 53 (consent order) 2.

[3]Class representatives Dr. Obiora Anyoku, Dr. Azuka Anyoku, Faith Adepoju, Uche Ukwuoma, and Newman Nkwor flew from New York to Lagos in December 2003 and were

3

plaintiffs were never flown on the first legs of their round-trip flights. Ultimately, World was assessed civil penalties of $350,000 for stranding passengers in violation of numerous federal statutes and regulations. Consent Order 6.

Passengers sued World, Ritetime, and Peter Obafemi, Ritetime's C.E.O., in state and federal courts throughout the country. The Panel on Multidistrict Litigation transferred the cases pending in other federal courts to the Eastern District of New York, where they were consolidated in this Court. Motions for default were granted against Ritetime and Obafemi on January 28 and October 13, 2005, respectively. This Court certified a class of plaintiffs on January 30, 2006. These motions for summary judgment ensued.


## DISCUSSION

Plaintiffs allege that World is liable for its failure to transport them under the Warsaw Convention or its successor, the Montreal Convention;[4] they also allege breach of contract, negligence, and fraud. World argues that it is entitled to summary judgment because (1) the Montreal Convention preempts plaintiffs' state law claims, and plaintiffs have not shown liability under the Convention itself; (2) even if plaintiffs' contract claims are not preempted, they should be dismissed since plaintiffs are not in privity with World; (3) even if the Montreal Convention

---

scheduled to return in January 2004. Class representatives Florence Bolaji Shonaiya, Mabel Inim, and Julia Njoku flew from Lagos to New York in 2003 and were scheduled to return to Lagos on December 28, 2003, January 20, 2004, and March 28, 2004, respectively.

[4]Although the parties dispute which Convention should apply, see Def.'s Mem. Supp. Mot. Summ. J. [hereinafter Def.'s Mem] 18 n.24; Pls.' Mem. Opp'n Mot. Summ. J. & Supp. Cross-Mot. Summ J. [hereinafter Pls.' Mem.] 3 n.4, the Court finds for the reasons explained below that the differences between the two conventions are not significant for purposes of these motions, and applies the Montreal Convention.

does not preempt plaintiffs' negligence and fraud claims, those claims are preempted by the Airline Deregulation Act; and (4) to the extent that plaintiffs' claims under the Montreal Convention are dismissed, the Court should decline to exercise supplemental jurisdiction over any remaining state law claims. Plaintiffs cross-move for summary judgment on their state law claims or, alternatively, on their claims under the Montreal Convention.

## A.     Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000) (quoting Taggart v. Time Inc., 924 F.2d 43, 46 (2d Cir. 1991)). Moreover, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). However, the nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the adverse party's pleading," Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (internal quotation marks and citation omitted). Rather, the party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If, after drawing all inferences, the court finds that an issue of material fact

remains, the motion for summary judgment must be denied.

## B.     The Montreal Convention

World argues that the Montreal Convention preempts plaintiffs' state law claims, and that

plaintiffs have failed to prove liability under the Convention itself. For the reasons explained

below, the Court grants World's motion for summary judgment with respect to plaintiffs' claims

under the Montreal Convention, but finds that the Convention does not preempt plaintiffs' state

law claims.

The Montreal Convention[5] entered into force in the United States on November 4, 2003,

updating and replacing the uniform system of liability for international air carriers previously

established by the Warsaw Convention. Ehrlich v. Am. Airlines, Inc., 360 F.3d 366, 371 n.4 (2d

Cir. 2004). Whereas the Warsaw Convention sought to encourage the development of

commercial aviation by limiting liability, the Montreal Convention reflects an additional

consideration: "the importance of ensuring protection of the interests of consumers in

international carriage by air and the need for equitable compensation based on the principle of

restitution." Id. (quoting Montreal Convention, pmbl.).

Article 19 of the Montreal Convention governs claims arising from delay in international

air transportation:

> The carrier is liable for damage occasioned by delay in the carriage by air of
> passengers, baggage or cargo. Nevertheless, the carrier shall not be liable for
> damage occasioned by delay if it proves that it and its servants and agents took all

---

[5]The Montreal Convention is formally known as the Convention for the Unification of
Certain Rules for International Carriage by Air Done at Montreal on 28 May 1999, reprinted in S.
Treaty Doc. No 106-45, 1999 WL 33292734 (2000).

measures that could reasonably be required to avoid the damage or that it was impossible for it or them to take such measures.[6]

Article 29 describes the Convention's preemptive effect: "In the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention . . . ." As Article 29 suggests, the Montreal Convention preempts state law claims falling within its scope. The Second Circuit has declared of the Warsaw Convention that "all state law claims that fall within the scope of the Convention are preempted.'" Fishman v. Delta Air Lines, Inc., 132 F.3d 138, 141 (2d Cir. 1998). Because the two conventions' preemptive language is substantially similar,[7] they have "substantially the same preemptive effect." Paradis v. Ghana Airways Ltd., 348 F. Supp. 2d 106, 111 (S.D.N.Y. 2004) ("Article 29 of the Montreal Convention simply clarified the language of . . . Article 24(1) of the Warsaw Convention.").

World characterizes plaintiffs' state law claims as sounding in delay. Def.'s Mem. at 20-21. Such claims, it argues, fall within the scope of Article 19 of the Montreal Convention and therefore are preempted under Article 29. Id. at 19-20. Plaintiffs respond that World's failure to transport them constitutes not delay, but nonperformance of a contract, and that their state law

---

[6]Article 19 of the Warsaw Convention consisted of the first of these two sentences; the Montreal Convention added the second sentence. As will be seen, the Court's disposition of these summary judgment motions turns on the meaning of the term "delay," not on whether World mitigated any damage to plaintiffs, or on whether mitigation would have been impossible. Thus this difference between the two conventions is not significant for present purposes.

[7]Article 24(1) of the Warsaw Convention provides that "in the carriage of passengers and baggage, any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention."

7

claims therefore are not preempted. Pls.' Mem. at 3-6. As explained below, the Court agrees that plaintiffs allege nonperformance, not delay. Accordingly, it finds that the Montreal Convention does not preempt plaintiffs' state law claims—but it also grants World's motion for summary judgment as to plaintiffs' claims for delay under the Montreal Convention.

As World observes, several courts, when presented with claims based on airlines' refusal to fly passengers, have construed those claims as sounding in delay within the scope of Article 19 of the Warsaw Convention. See Def.'s Mem. at 20-21 (citing, inter alia, Paradis, 348 F. Supp. 2d at 113-14; Minhas v. Biman Bangladesh Airlines, No. 97 Civ. 4920, 1999 U.S. Dist. LEXIS 9849, at *8 (S.D.N.Y. June 30, 1999); Alam v. Pakistan Int'l Airlines Corp., No. 92 Civ. 4356, 1995 U.S. Dist. LEXIS 11919, at *6 & n.9 (S.D.N.Y. July 27, 1995); Malik v. Butta, No. 92 Civ. 8703, 1993 U.S. Dist. LEXIS 14472, at *10 & n.11 (S.D.N.Y. Oct. 14, 1993)). However, in each of these cases, as well as in others reaching similar conclusions, circumstances existed which militated in favor of a finding of delay, and are absent here. In some, the defendant airlines ultimately provided plaintiffs with transportation. See, e.g., Ikekpeazu v. Air France, No. 3:04cv0711, 2004 U.S. Dist. LEXIS 24580, at *2 (D. Conn. Dec. 6, 2004); Fields v. BWIA Int'l Airways Ltd., No. 99-CV-2493, 2000 U.S. Dist. LEXIS 9397, at *15 (E.D.N.Y. July 7, 2000); Sassouni v. Olympic Airways, 769 F. Supp. 537, 538 (S.D.N.Y. 1991). In others, plaintiffs either secured alternate transportation without waiting to find out whether the defendant airlines would transport them, see, e.g., Oparaji v. Virgin Atl. Airways, Ltd., No. 04-CV-1554, 2006 U.S. Dist. LEXIS 68636, at *11 (E.D.N.Y. Sept. 25, 2006); Paradis, 348 F. Supp. 2d at 112; or refused an offer of a later flight, see, e.g., Igwe v. Northwest Airlines, Inc., No. H-O5-1423, 2007 U.S. Dist. LEXIS 1204, at *4 (S.D. Tex. Jan. 4, 2007). In still others, plaintiffs never actually alleged

nonperformance. See, e.g., Minhas, 1999 U.S. Dist. LEXIS 9849, at *8 n.4 (finding plaintiff's claim governed by Article 19 where she did not allege nonperformance); Alam, 1995 U.S. Dist. LEXIS 11919, at *7-8 (denying motion to dismiss plaintiffs' Article 19 claim where they had sufficiently alleged delay); Malik, 1993 U.S. Dist. LEXIS 14472, at *10 (finding plaintiffs' state law claims preempted by Article 19 where they conceded that their claim was for delay).

Here, by contrast, plaintiffs have shown that World simply refused to fly them, without offering alternate transportation. Although World flew more than 300 stranded passengers from Lagos to New York in a single flight on January 19, 2004, and subsequently returned 20 other stranded passengers from the United States to Lagos, World arranged transportation for these individuals only after explicitly disavowing any obligation to do so—indeed, it described the January 19 flight as "a humanitarian gesture of goodwill." Consent Order 3. Moreover, World conducted these flights only after "considerable discussion" with the enforcement division of the United States Department of Transportation. Id. Meanwhile, many other stranded passengers were simply abandoned. That some plaintiffs were flown on the first legs of their flights does not alter the Court's conclusion. See Weiss v. El Al Israel Airlines, Ltd., 433 F. Supp. 2d 361, 367 (S.D.N.Y. 2006) ("[T]hat the airline provided one flight according to contract does not necessarily render the failure to provide carriage on another flight a mere delay rather than a total failure to perform."); see also 9 Arthur Linton Corbin, Contracts § 945 (interim edition 2002) ("A breach of contract may be large or small, total or partial. A debtor may pay nine-tenths of his debt, but fail to pay the other tenth. He has committed a breach of contract.").

Because World simply refused to transport plaintiffs, rather than merely delaying them, the facts of this case are analogous, not to the cases World cites, but to a Seventh Circuit decision

9

relied upon by plaintiffs, Wolgel v. Mexicana Airlines, 821 F.2d 442 (7th Cir. 1987). The plaintiffs in Wolgel were purchasers of round-trip tickets from Chicago to Acapulco on Mexicana Airlines. Id. at 442. They were bumped from their flight but not placed on a later Mexicana flight. Id. at 445. Observing that the plaintiffs had "never left the airport," the Seventh Circuit construed their claim as sounding in nonperformance, not delay. Id. Next, in order to determine whether the plaintiffs' claims were preempted by the Warsaw Convention, the court looked to the Convention's drafting history, and found that the delegates to the Convention had concluded that "there was no need for remedy in the Convention for total nonperformance of the contract, because in such a case the injured party has a remedy under the law of his or her home country." Id. at 444 (citing Second International Conference on Private Aeronautical Law, Minutes 76-77 (R. Horner & D. Legrez trans. 1975)). Thus the delegates had "agreed that the Convention should not apply to a case of nonperformance of a contract." Id. In view of this history, the court held, the plaintiffs' claims were not preempted.

As World points out, Def.'s Mem. at 21-22 & n.28, at least two district courts of this circuit, relying on El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155 (1999), have questioned Wolgel. See Paradis, 348 F. Supp. 2d at 113 ("Wolgel's distinction between 'bumping' and 'delay' has been undercut by the U.S. Supreme Court's message in Tseng 'that the application of the Convention is not to be accomplished by a miserly parsing of its language.'") (quoting King v. Am. Airlines, 146 F. Supp. 2d 159, 162 (N.D.N.Y. 2001)). This Court does not agree that Tseng "undercuts" Wolgel, at least not for present purposes. At issue in Tseng was whether the plaintiff's state law claim based on psychological harm was preempted by Article 17 of the Warsaw Convention, which made air carriers liable for injuries "sustained in the event of the

10

death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Previous to Tseng, the Court had held that claims arising from purely psychological injuries were not actionable under Article 17. Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 553 (1991). In Tseng, it held that the plaintiff's claim, though not *actionable* under Article 17, nevertheless was within the *scope* of Article 17, which it read to cover "all personal injury cases stemming from occurrences on board an aircraft or in embarking or disembarking." 525 U.S. at 169. On this basis, it held that Article 17 precluded the plaintiff from pursuing her claim under state law. Id. at 176. The Court noted, however, that the plaintiff's state law claim would *not* have been preempted if it had been outside Article 17's scope: "The Convention's preemptive effect on local law extends no further than the Convention's own substantive scope. A carrier, therefore, is indisputably subject to liability under local law for injuries arising outside of that scope: e.g., for injuries occurring before any of the operations of embarking or disembarking." Id. at 171 (internal quotation marks and citations omitted). This qualification describes Wolgel. In Wolgel, the Seventh Circuit held not merely that the plaintiffs' claim for nonperformance was not actionable under Article 19, but also that it was outside Article 19's substantive scope, and therefore not preempted. 821 F.2d at 444 ("We conclude that the Wolgels' claim falls outside the Warsaw Convention . . . .").

The Court finds the reasoning of Wolgel persuasive, and applies it here. The plain language of Article 19 of the Montreal Convention indicates that it governs claims for delay, not nonperformance. Moreover, as the Seventh Circuit explained, the drafting history of the Warsaw Convention's Article 19—whose pertinent language is identical to its Montreal Convention

11

counterpart—indicates that it was not intended to cover claims for nonperformance. As already noted, the Supreme Court has observed of the Warsaw Convention, whose preemptive effect is the same as that of the Montreal Convention, that "[its] preemptive effect on local law extends no further than [its] own substantive scope." Tseng, 525 U.S. at 172. Because plaintiffs' state law claims are grounded in nonperformance, not delay within the substantive scope of Article 19, the Court concludes that Article 19 does not preempt plaintiffs from pursuing those claims. However, by the same logic, the Court also finds that plaintiffs have failed to allege delay under Article 19, grants World's motion for summary judgment with respect to plaintiffs' Montreal Convention claims, and denies plaintiffs' cross-motion for summary judgment on those claims.

Finally, the Court notes that its holding with regard to preemption applies not only to plaintiffs' state law contract claims, but also to their claims of fraud and negligence. Although, as World observes, some courts have found fraud and negligence claims preempted by the Convention, they have done so where those claims arose from injuries within the Convention's substantive scope, e.g., personal injuries resulting from accidents (Article 17), lost or damaged luggage (Article 18), or delay (Article 19). See, e.g., Bloom v. Alaska Airlines, 36 Fed. Appx. 278, 280-81 (9th Cir. 2002) (fraud claim preempted where it "arose from the same discrete event" as plaintiff's claim for intentional infliction of emotional distress, which was not actionable under Article 17 but nevertheless within its scope); Yanovskiy v. Air France, No. 98-9055, 1999 U.S. App. LEXIS 8218 (2d Cir. 1999), at *3 (fraud and misrepresentation claims preempted where they arose from damaged baggage and delay, since "all state law claims allegedly arising from a damaging event covered by the Convention . . . are preempted") (citing Shah v. Pan Am. World Servs., Inc., 148 F.3d 84, 97 (2d Cir. 1998)); Cruz v. Am. Airlines, Inc.,

193 F.3d 526, 530-31 (D.C. Cir. 1999) (claims for fraud and deceit preempted where court concluded that "the 'substantive scope' of Article 18 must extend at least as far as to encompass [plaintiffs'] common law claims") (quoting Tseng, 525 U.S. at 160-61); Shah, 148 F.3d at 97-98 (claims for rescission, negligence, and fraud preempted where "[a]ll of . . . plaintiffs' common law claims are 'within the scope' of Article 17 of the Convention, in that they all seek damages for 'the death or wounding of a passenger or any other bodily injury suffered by a passenger' caused by an 'accident . . . on board [an] aircraft' in international transportation") (citations omitted, third and fourth alterations in original); Shirobokova v. CSA Czech Airlines, Inc., 376 F. Supp. 2d 439, 442 (S.D.N.Y. 2005) (claims for negligence, breach of warranty, and negligent misrepresentation preempted where plaintiff sued "seek[ing] redress for injuries that she suffered during 'an accident . . . within the meaning of Article 17 of the Warsaw Convention' on her flight . . . .") (internal quotation marks and citation omitted). Here, by contrast, the underlying injury from which plaintiffs' tort claims arise—total refusal to fly ticketed passengers—has *not* been shown to be within the scope of Article 19, or any other provision of the Convention. Thus those claims are not preempted.

## C. Breach of Contract

World next argues that even if plaintiffs' contract claims are not preempted, those claims nevertheless must be dismissed, since privity of contract never existed between plaintiffs and itself. Plaintiffs respond that the tickets themselves establish privity, or, in the alternative, that World is liable on the basis of apparent authority or ratification. For the reasons explained below, the Court agrees with World that the tickets themselves do not establish a contract

between World and plaintiffs. With regard to plaintiffs' other theories of liability, the Court finds that plaintiffs have created an issue of fact as to whether World is liable for Ritetime's actions, precluding summary judgment for World, but also that plaintiffs have presented insufficient evidence to warrant summary judgment in their favor. Thus, with respect to plaintiffs' contract claims, both parties' motions for summary judgment must be denied.

In order to evaluate plaintiffs' state law claims, the Court must identify the jurisdiction whose substantive law properly governs this dispute. In undertaking this task, the Court looks to New York's choice of law rules. Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989) ("A federal court . . . adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state.") (citing, inter alia, Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). Under New York's rules, the "first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws," Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) (citing Matter of Allstate Ins. Co. & Stolarz, 613 N.E.2d 936, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904 (1993)). Where a conflict has been found to exist, New York courts take a "flexible approach" whose goal is "to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1030 (2d Cir. 1996) (citing Babcock v. Jackson, 191 N.E.2d 279, 283-84, 12 N.Y.2d 473, 481-82, 240 N.Y.S.2d 743, 749 (1963)). More specifically, in the contract law context, New York courts use a "center of gravity" or "grouping of contacts" approach, considering "a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." Id. at 1030-31 (citing Stolarz, 613

N.E.2d at 940).

In this case, there are three jurisdictions whose law might apply—New York, Georgia,

and Nigeria. Without providing detailed briefing on the choice of law question, World suggests

that an actual conflict of laws may exist between Nigerian contract law and its domestic

counterparts.[8] World notes that "Nigeria is a federal state which, like the U.S., does not have the

same law in each jurisdiction," and cites scholarly authority for the proposition that Nigeria

exhibits "a multifaceted legal pluralism . . . consisting of English-style laws, Islamic law and a

wide variety of customary laws operating against the background of a three-tier federal system."

Def.'s Reply 5. But World identifies no specific legal principles upon which Nigeria and the

domestic jurisdictions differ. Plaintiffs respond that no conflict exists, since "both Nigerian and

United States law are rooted in English common law." Pls.' Mem. 6 n.8. Like World, however,

plaintiffs make little effort to describe the substance of relevant Nigerian legal principles,

offering only the affidavit of Femi Olubanwo, a Nigerian attorney, who avers that "[u]nder

Nigerian law a valid contract is formed upon offer, acceptance, and transfer of consideration,"

"upon the breach of a contract the injured party is always entitled to an action for damages

against the breaching party," and "recoverable damages upon the breach of a contract are those

damages which were reasonably foreseen or contemplated by the parties during their negotiations

or at the time the contract was executed." Monroe Aff. Ex. 79 (Olubanwo Aff.) ¶¶ 5-7.

Meanwhile, neither party argues that the Court should apply the law of any jurisdiction in

---

[8]World also notes that class members reside in "at least 40 states," and criticizes plaintiffs for "appear[ing] to assume that for plaintiffs that are U.S. residents all contract claims would be governed by law identical to New York law," Def.'s Reply Mem. Supp. Summ. J. [hereinafter Def.'s Reply] 5 n.2. But World provides no briefing on specific differences among potentially applicable domestic legal regimes.

particular, foreign or domestic. And in their discussions of specific contract and agency principles that might be relevant to this case, both parties rely almost exclusively on citations to the law of New York.

By describing Nigerian law as an amalgam of English common law and customary law, World has succeeded in creating some ambiguity about whether, as a general matter, with respect to Nigeria, courts may safely apply "the [traditional] presumption . . . that the common law still prevails there and that it is the same as the common law of New York. . . ." Loebig v. Larucci, 572 F.2d 81, 85 (2d Cir. 1978) (quoting Arams v. Arams, 182 Misc. 328, 45 N.Y.S.2d 251, 254 (Sup. Ct. 1943)). But that is all World has done. By no means has it adduced sufficient evidence to prove that a conflict of laws exists with respect to the legal principles relevant to this case. Far from demonstrating that Nigerian courts take a different view of contract formation, agency, apparent authority, or ratification than do the courts of New York, World has offered no evidence at all about how Nigerian courts would approach these issues. Under these circumstances, the Court is not obliged to undertake its own analysis of Nigerian law to determine whether a conflict exists; nor will it. See id. ("Rule 44.1 of the Federal Rules of Civil Procedure permits parties to present information on foreign law, and the court may make its own determination of foreign law based on its own research, but it is not mandatory that it do so."); Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150, 155 n.3 (2d Cir. 1968) ("Though . . . Rule 44.1 establishes that courts may, in their discretion, examine foreign legal sources independently, it does not require them to do so in the absence of any suggestion that such a course will be fruitful or any help from the parties.").

Instead, applying New York choice of law principles for cases involving foreign

jurisdictions, the Court finds that New York law properly controls this dispute. See O'Keefe v. Honda Motor Co., Ltd., No. 96 CV 1418, 1998 U.S. Dist. LEXIS 8830, at *19 (E.D.N.Y. Mar. 31, 1998) ("When parties have failed to submit evidence on the content of foreign law, courts in this circuit applying New York choice of law rules have found that the forum's law should be applied based on a rebuttable presumption that no conflict exists."); Indep. Order of Foresters v. Donaldson, Lufkin & Jenrette, Inc., 919 F. Supp. 149, 152 (S.D.N.Y. 1996) ("In New York, it is required that a party wishing to apply the law of a foreign state show how that law differs from the forum state's law. Failure to do so results in the application of New York law."); Argonaut P'ship, L.P. v. Bankers Trustee Co. Ltd., No. 96 Civ. 1970, 1997 U.S. Dist. LEXIS 1092, at *40 (S.D.N.Y. Feb. 4, 1997) ("[W]hen parties have failed to submit evidence on the content of foreign law, courts in this Circuit applying New York choice of law rules have found that the forum's law should fill the gaps.").

Other courts of this circuit, in similar cases, have taken the same approach. See, e.g., Nameh v. Muratex Corp., 34 Fed. Appx. 808, 810 (2d Cir. 2002) (summary order) ("New York law properly governed the agreement because [plaintiff], despite advocating application of Polish law, failed to produce sufficient evidence of Polish contract law to demonstrate that the law of contract formation in Poland conflicted with the law of the forum state."); Wasserstein Perella Emerging Markets Finance, L.P. v. Province of Formosa, No. 97 Civ. 793, 2002 U.S. Dist. LEXIS 12012, at *33 (S.D.N.Y. July 2, 2002) ("Defendant presented no argument or evidence of Argentinean law with respect to any issue other than actual and apparent authority; therefore, the court finds that New York law properly governs all other issues pertinent to this dispute."); Haywin Textile Prods., Inc. v. Int'l Finance Investment & Commerce Bank Ltd., 152 F. Supp. 2d

17

409, 413-14 (S.D.N.Y. 2001) (applying New York law where defendant "has not demonstrated that Bangladeshi law regarding successor liability is significantly different from New York law"); Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc., No. 02 CV 7666, 2005 U.S. Dist. LEXIS 8896, at *12-13 (S.D.N.Y. May 11, 2005) (applying New York law because "neither party advocates application of the law of Indonesia, and the Court is under no obligation to make a determination of foreign law based on its own research.").

A final factor counseling in favor of the application of New York law is that the parties have relied almost exclusively on the law of New York in briefing their arguments with respect to the relevant principles of contract and agency law. See In the Matter of the Arbitration Between Tehran-Berkeley Civil and Env't'l Engineers and Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989) ("Iranian law could apply, since the contract was executed and performed in that country. The parties' briefs, however, rely on New York law. Under the principle that implied consent to use a forum's law is sufficient to establish choice of law, we will apply New York law to this case.") (internal citation omitted); Lehman v. Dow Jones & Co., Inc., 783 F.2d 285, 294 (2d Cir. 1986) ("Although [plaintiff] does not concede that New York law would apply, he, like [defendant], cites only New York cases. Under these circumstances we do not feel obliged to undertake an investigation to determine whether there is any difference in the California law and what law a California court would apply if there were.").

Having identified the applicable law, the Court turns to the substance of plaintiffs' contract claim. In response to World's contention that privity of contract never existed between plaintiffs and itself, plaintiffs first argue that the tickets themselves establish privity, and that "the Court's inquiry should begin and end with the ticket." Pl.'s Mem. at 8. The Court disagrees. It

is true that "[i]n the transportation of passengers, the relevant transportation contract is generally the passenger ticket." Shen v. Japan Airlines, 918 F. Supp. 686, 688 (S.D.N.Y. 1994). See also In re Air Crash Disaster of Aviateca Flight 901, 29 F. Supp. 2d 1333, 1341 (S.D.N.Y. 1997) ("In determining the parties' intentions, the Court must look to the terms of the contract for transportation, in this case, the airline tickets."); Kelley v. Societe Anonyme Belge d'Exploitation de la Navigation Aerienne, 242 F. Supp. 129, 144 (E.D.N.Y. 1965) (noting that airline ticket "constitutes the contract made by the parties") (internal quotation marks and citation omitted); Rinck v. Deutsche Lufthansa A.G., 57 A.D.2d 370, 371-72, 395 N.Y.S.2d 7, 9-10 (App. Div. 1977) (observing that where carrier sold ticket to passenger, "there was mutuality of obligation and a binding contract of carriage."). It is also true that certain features of the tickets, which were printed in accordance with specifications provided to the printer by World, see Monroe Aff. Ex. 14 (Def.'s Response to Pls.' Requests for Admission) ¶ 30, suggest a direct contract between plaintiffs and World. In particular, although corporate logos for both Ritetime and World appear on the front of the ticket, the Conditions of Contract, on a subsequent page, appear over World's name alone. Costello Aff. Ex. 34 (ticket). However, plaintiffs have not shown that World sold them their tickets. Indeed, the only evidence of a direct purchase is the deposition testimony of plaintiff Florence Bolaji Shonaiya that her daughter bought a ticket at the World Airways office in Lagos.[9] Monroe Aff. Ex. 3 (Shonaiya Dep.) 5. This testimony, standing alone, is insufficient to overcome World's insistence that it did not sell tickets for the Nigeria flights, see id. Ex. 76 (Ellington Dep.) 78 (statement of World's president that "World Airways does not sell the

---

[9]The record also contains the deposition testimony of one plaintiff that she *collected* her ticket, which another individual had purchased for her in the United States, at the World Airways office in Lagos. Monroe Aff. Ex. 7 (Njoku Dep.) 5.

tickets"), or to substantiate plaintiffs' contention that a direct contracting relationship existed between themselves and World. The Court therefore declines to grant summary judgment for plaintiffs on this basis.

Plaintiffs next argue that even if the tickets themselves do not establish privity, "World is bound by the acts of its agent, Ritetime, in entering into contracts with passengers on World's behalf, which World breached." Pls.' Mem. 15. World responds Ritetime was not its agent; rather, according to World, it was *Ritetime's* agent.[10] Def.'s Mem. 7-9. The Court declines to grant summary judgment for World on this basis. In New York, as elsewhere, agency is defined as "a fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." L. Smirlock Realty Corp. v. Title Guar. Co., 70 A.D.2d 455, 464, 421 N.Y.S.2d 232, 238 (App. Div. 1979). See also Cabrera v. Jakabovitz, 24 F.3d 372, 386 (2d Cir. 1994) ("Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the

---

[10]World actually offers contradictory claims on the question of agency. In one instance, characterizing itself as a vendor of services, it claims that "the relationship between the parties was not intended to be that of principal and agent." Def.'s Mem. 7. Elsewhere, however, it characterizes itself as an agent and Ritetime as the principal. See, e.g., id. at 9; Def.'s Reply 6-7. The Court need not address these theories separately, since both aim at the same target: disproving plaintiffs' claim that Ritetime was World's agent. Moreover, even a finding that World acted as Ritetime's agent for some purposes would not rule out the possibility that Ritetime acted as World's agent for others. See Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) ("There is no merit in [defendant's] argument, which is based on the mistaken notion that a party must be either solely a principal or solely an agent."); Restatement 3d of Agency § 3.14 cmt. c ("The same actor may occupy different roles at successive points in an ongoing interaction among the same parties.").

undertaking.") (quoting Restatement 2d of Agency § 1 cmt. b (1958)). An agent has "the power to alter the legal relationship between his principal and third parties in matters within the scope of the agency," Smirlock Realty, 70 A.D.2d at 464 (citations omitted), but cannot be held liable in a disclosed principal's stead, Sweeney v. Herman Mgmt., Inc., 85 A.D.2d 34, 36, 447 N.Y.S.2d 164, 166 (App. Div. 1982) ("The principle has long been established that an agent acting on behalf of a disclosed principal will not be personally bound, absent clear and explicit evidence of the agent's intention to substitute or add his personal liability for or to that of his principal."). Rather, "a principal . . . is liable on contracts entered into on its behalf by an authorized agent . . . ." Key Int'l Mfg., Inc. v. Morse/Diesel, Inc., 142 A.D.2d 448, 453, 536 N.Y.S.2d 792, 795 (App. Div. 1988).

The existence of an agency relationship "is a mixed question of law and fact." Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 462 (2d Cir. 2003). "[A]gency is a question of law for the court where the material facts from which it is to be inferred are not in dispute, the question of agency is not open to doubt, and only one reasonable conclusion can be drawn from the facts in the case." Cabrera, 24 F.3d at 386 n.14 (quoting 3 C.J.S. Agency § 547 (1973)). Conversely, "where the circumstances raise the possibility of a principal-agent relationship, and no written authority for the agency is established, questions as to the existence and scope of the agency must be submitted to the jury." Time Warner City Cable v. Adelphi Univ., 27 A.D.3d 551, 553, 813 N.Y.S.2d 114, 116 (App. Div. 2006). See also Hedemann v. Fairbanks, Morse & Co., 286 N.Y. 240, 248-49, 36 N.E.2d 129, 133 (1941) ("If the question of agency is not open to doubt, it is one for the court. But where no written authority of the agent has been proven, questions of agency and of its nature and scope and of ratification by

or estoppel of the principal, if dependent upon contradictory evidence or evidence, though not contradictory or disputed, from which different inferences reasonably may be drawn, are questions of fact to be submitted to the jury under proper instructions by the court."). Finally, "[t]alismanic language alone does not determine an agency relationship." In the Matter of Shulman Transport Enters., Inc., 33 B.R. 383, 385 (S.D.N.Y. 1983). Instead, "[c]ourts must look to the substance of the relationship," since agency depends upon "the existence of the required factual elements creating a fiduciary relation." Id.

On the question whether Ritetime was World's agent, or vice versa, the evidence is in conflict. As World points out, Def.'s Mem. 9 n.9, the DOT regulations governing charter flight programs describe the charter operator (the position occupied by Ritetime, World argues) as the "principal," see 14 C.F.R. § 380.32(x). Likewise, certain language of the Charter Agreement supports World's claim to have acted as Ritetime's agent: The Agreement authorizes World to "make such decisions on behalf of [Ritetime] as are necessary" and indicates that Ritetime "ratifies" such decisions in advance. Charter Agreement 5. But while the Charter Agreement expressly stipulates that World acts as Ritetime's agent where it helps to secure ground transportation, hotel reservations, or other "special services," id. at 2, it makes no such stipulation with regard to the core business of the flight program: international air travel. Moreover, "talismanic language" alone is insufficient to prove the existence of an agency relationship—the question is whether the record contains the required factual elements, Shulman, 33 B.R. at 385—and in this regard, World falls short. While it may be that World lacked control over some features of the flight program, including "Ritetime's flight schedule, pricing, [and] marketing to the public, [and] the data that Ritetime collected from passengers," Def.'s Mem. 7,

the Charter Agreement plainly empowers World to control other features, e.g., by canceling "all or any flights," by determining the time of boarding and departure of any flight, by refusing to carry passengers and luggage under certain circumstances, by substituting landing facilities or aircraft at its discretion, and by exercising "exclusive control" over all aircraft and crew, Charter Agreement 3-5. Furthermore, while World is correct that under traditional agency principles, "the principal must maintain control over key aspects of the undertaking," Commercial Union Ins., 347 F.3d at 462, "[c]ontrol is not a crucial question where the issue is liability for a contract," id. Finally, World is correct that the principal, not the agent, ordinarily bears the risk associated with an agency relationship,[11] see Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1429 n.29 (2d Cir. 1988)—but the facts do not support World's unqualified claim that because the Charter Agreement called for World to be paid "regardless of the number of passengers on board a flight," the program's risk "was intended to be allocated to Ritetime," Def.'s Mem. 8. Under the terms of the Charter Agreement, Ritetime was authorized to cancel any flight provided that it notified World. Charter Agreement 3. If Ritetime did so, and gave timely notice, World stood to collect substantially less than the full charge specified for any cancelled flight. Id. 3-4 (specifying, e.g., that if Ritetime gave at least 120 days' notice when cancelling a flight, it would be required to pay only 20 percent of the agreed-upon charge for that flight). Thus World's claim that it did not act as Ritetime's agent is "dependent upon contradictory evidence or evidence, though not contradictory or disputed, from which different

---

[11]The Court notes that the case relied upon by World for the proposition that risk allocation "has been described as the *most* important" factor, Def.'s Mem. 7 (emphasis added), concerns the question whether two parties executed a cooperative mailing, not whether a traditional agency relationship existed, see United States v. Raymond & Whitcomb Co., 53 F. Supp. 2d 436, 441 (S.D.N.Y. 1999).

23

inferences reasonably may be drawn." Hedemann, 36 N.E.2d at 133.

Nor is the Court persuaded by World's citation to several arguably analogous cases involving freight forwarders. See Def.'s Mem. 8-9 (citing James N. Kirby, Pty Ltd. v. Norfolk S. Ry. Co., 300 F.3d 1300 (11th Cir. 2002); Shulman, 33 B.R. 383; Sail Am. Found. v. M/V T.S. Prosperity, 778 F. Supp. 1282 (S.D.N.Y. 1991); Delta Air Lines, Inc. v. Tie Cargo Corp., 1996 U.S. Dist. LEXIS 22755 (E.D.N.Y. Oct. 17, 1996)). In Kirby, the case relied upon most heavily by World, the Eleventh Circuit found that a freight forwarder acted as a principal, not as a cargo owner's agent, where it "t[ook] on the role of carrier itself, and issue[d] its own bill to the cargo owner listing the cargo owner as the shipper and itself as the carrier," rather than "merely . . . arrang[ing] a contract between the cargo owner and the ocean carrier" under which the ocean carrier would issue a bill of lading to, and be paid directly by, the cargo owner. 300 F.3d at 1305. World suggests that Ritetime, like the freight forwarder in Kirby, is properly characterized as a principal, not an agent. But the question in Kirby, how to characterize the relationship between intermediary and cargo owner, was different from the one at issue here: how to characterize the relationship between intermediary and *carrier*. Also, the facts of this case are distinguishable in at least one critical respect from those of Kirby: Ritetime did not obviously list "itself as the carrier" on the document equivalent in this context to the freight forwarder's bill of lading, since plaintiffs' tickets bore both Ritetime's name and World's. Finally, World has failed to acknowledge that on appeal, the Supreme Court eschewed the Eleventh Circuit's approach, declaring that "reliance on agency law is misplaced here" and treating the freight forwarder as the cargo owner's *agent*, not as a principal. Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd., 543 U.S. 14, 34 (2004). The Court notes, as well, that courts in other freight forwarding cases have

24

reached divergent results. Although, in the three other cases World cites, courts declined to find that freight forwarders had acted as carriers' agents, see Shulman, 33 B.R. at 384; Sail America Found., 778 F. Supp. at 1287; Delta Air Lines, 1996 U.S. Dist. LEXIS 22755, at *6, the Second Circuit has held more recently that a freight forwarder *was* a carrier's agent. Commercial Union, 347 F.3d at 462 ("[I]t is incontrovertible that [the freight forwarder] was acting as an agent for [the airline], at least for the purpose of entering into a contract for carriage on its behalf.").

Similar diversity appears among other arguably analogous cases, including those in which one carrier issues passenger tickets while another actually provides passage. Compare Grajales-Romero v. Am. Airlines, Inc., 194 F.3d 288, 293-94 (1st Cir. 1999) (finding that, where national airline issued ticket, and regional carrier operated flight, jury reasonably concluded that national airline was principal and regional carrier was agent), with Kapar v. Kuwait Airways Corp., 845 F.2d 1100, 1103 (D.C. Cir. 1988) (citing "the well-settled principle that an airline that issues a ticket for carriage on another airline acts only as the *agent* for the actual carrier") (emphasis in original). Diversity of opinion also appears among cases involving travel agents. Compare Al Harby v. Saadeh, 816 F.2d 436, 438-39 (9th Cir. 1987) (travel agent was not airline's agent), and Simpson v. Compagnie Nationale Air France, 42 Ill. 2d 496, 499, 248 N.E.2d 117, 120 (1969) (same), with Rappa v. Am. Airlines, Inc., 87 Misc. 2d 759, 763, 386 N.Y.S.2d 612, 615 (Civ. Ct. Queens County 1976) (travel agent was airline's agent), and Unger v. Travel Arrangements, Inc., 25 A.D.2d 40, 42, 266 N.Y.S.2d 715, 717 (App. Div. 1966) (travel agent was cruise line's agent), with Spiro v. Pence, 149 Misc. 2d 613, 615, 566 N.Y.S.2d 1010, 1012 (City Ct. Albany 1991) (travel agent was an independent contractor, not an agent). In short, the cases provide no hard-and-fast rule of law governing situations such as the Court confronts here. The required

determination is one of fact, and the relevant facts are disputed. Summary judgment for World on this point therefore is inappropriate.[12]

The Court turns next to plaintiffs' theory of apparent authority. Apparent authority is "that authority which the principal holds the agent out as possessing, or which he permits the agent to represent that he possesses . . . ." Roth v. Ducks Hockey Club, 52 Misc. 2d 533, 534, 276 N.Y.S.2d 246, 248 (Dist. Ct. Suffolk County 1966). The doctrine of apparent authority is rooted in that of estoppel; where a third party changes his position in reliance on the reasonable belief that an agent is acting within the scope of his authority, "the principal is estopped to deny that the agent's act was not authorized." Masuda v. Kawasaki Dockyard Co., Ltd., 328 F.2d 662, 665 (2d Cir. 1964). Apparent authority exists only where "words or conduct of the principal, communicated to a third party . . . give rise to the appearance and belief that the agent possesses authority to enter into a transaction." Hallock v. State of New York, 64 N.Y.2d 224, 231, 474 N.E.2d 1178, 1181, 485 N.Y.S.2d 510, 513 (1984). The existence of apparent authority requires, as well, that the third party "relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal—not the agent." Id. (citation omitted). Finally, the third party's reliance on the appearance of authority must have been reasonable. Id. While a grant of summary judgment as to apparent authority may be appropriate under some circumstances, see Minskoff v. Am. Express Travel Related Servs. Co., Inc., 98 F.3d 703, 708 (2d Cir. 1996), "[t]he existence of apparent authority is normally a question of fact, and therefore

---

[12]Moreover, even a finding that Ritetime was not World's agent would not preclude plaintiffs from prevailing on their ratification theory, since under New York law, "[i]t is not necessary that the person acting be the agent of the ratifier." J.M. Heinike Assocs., Inc. v. Chili Lumber Co., 83 A.D.2d 751, 752, 443 N.Y.S.2d 512, 513 (App. Div. 1981)).

26

inappropriate for resolution on a motion for summary judgment," id.

The Court declines to grant summary judgment for either party on the question of apparent authority. Plaintiffs claim that because Nigerian passengers are wary of charter programs, "World actively helped Ritetime advertise and market the Nigeria Flight Service Program in such a manner so as to conceal the charter nature of the flight program." Pls.' Opp'n to Def.'s Stat't of Material Facts ¶ 28. In other words, according to plaintiffs, Ritetime and World together sought to induce passengers to whom Ritetime sold tickets for the Nigeria flight program to believe that they were purchasing tickets for passage on World Airways. On this point, plaintiffs have succeeded in creating a question of fact.

First, the tickets themselves appear likely to have created ambiguity about whether purchasers of tickets for the flight program were contracting with Ritetime, World, or both. World acquiesced in Ritetime's request that the word "charter" not appear on the first page of the tickets, and permitted its own name to appear alone under the "Conditions of Contract" on a subsequent page. See Monroe Aff. Ex. 14 (Def.'s Response to Pls.' Requests for Admission) ¶ 28; Costello Aff. Ex. 34 (ticket). These features appear to have signaled to plaintiffs that their bargain was with World, even though, as World points out, Def.'s Reply 9, the word "charter" appears elsewhere on the ticket. And the Court is unpersuaded by World's objection that because plaintiffs received the tickets only after concluding their purchases, they could not have relied upon any appearance of authority created by the tickets. See Grajales-Romero, 194 F.3d at 293-94 (citing, as evidence of a regional carrier's apparent authority to contract on behalf of a national airline, the appearance of the ticket); Schaeffer v. Cavallero, 29 F. Supp. 2d 184, 186 n.4 (S.D.N.Y. 1998) (finding that a triable issue of fact existed as to whether a regional carrier had

actual or apparent authority to contract on behalf of a national airline where, <u>inter alia</u>, the national airline's name appeared on the ticket).

Second, as plaintiffs observe, the record indicates that World was aware that Ritetime and Obafemi "actively misrepresented themselves as World Airways or the fictional entity 'Ritetime-World Airways,'" Pls.' Mem. 10, but did little to halt these deceptive practices. World has admitted that it "became aware that Ritetime had, on occasion, used World's name, logo and other trademarks in a manner inconsistent with the terms of the Trademark License Agreement." Monroe Aff. Ex. 14 (Def.'s Response to Pls.' Requests for Admission) ¶ 46. <u>See also</u> Monroe Aff. Ex. 21 (DuBois Dep.) 45 (testimony of World's sales director that he knew Obafemi had "held himself out to be World Airways Nigeria"); <u>id.</u> Ex. 42 (Perry Dep.) 80-81 (testimony of World's vice president for business development that he knew Obafemi had produced and distributed an in-flight magazine describing himself as "the president of Ritetime/World Airways"); <u>id.</u> Ex. 78 (in-flight magazine describing Obafemi as "Chairman, chief Executive, Ritetime World Airways"). Despite learning of Obafemi's misconduct as early as "30, 45 days into the program," <u>id.</u> Ex. 42 (Perry Dep.) at 81, and although it was empowered to terminate its Trademark License Agreement with Ritetime "upon notice and for cause," Costello Aff. Ex. 11 (License Agreement) 3, World responded only by mailing Obafemi a single cease-and-desist letter on May 30, 2003, Monroe Aff. Exs. 14 (Def.'s Response to Pls.' Requests for Admission) ¶ 50, 74 (letter) and by orally cautioning him several times, <u>id.</u> Ex. 21 (DuBois Dep.) 52. World objects that it "did not make any representations that would confer apparent authority on Ritetime," Def.'s Mem. 9, and cites "a dearth of precedent" for the notion that silence may create apparent authority, <u>id.</u> 10 n.10. But silent acquiescence such as World appears to have exhibited

here can indeed create apparent authority. See Trustees of the Am. Fed'n of Musicians & Employers' Pension Fund v. Steven Scott Enters., Inc., 40 F. Supp. 2d 503, 511 (S.D.N.Y. 1999) (quoting Scientific Holding Co. v. Plessey Inc., 510 F.2d 15, 25 (2d Cir. 1974)) ("A principal is estopped from denying the apparent authority of its agent when it remains 'silent when [it] had the opportunity of speaking and when [it] knew or ought to have known that [its] silence would be relied upon, and that action would be taken or omitted which [its] statement of truth would prevent . . . .'").

Third, and finally, displays of World's name and logo at the airports involved in the flight program may have contributed to the appearance that Ritetime had authority to contract on World's behalf. See Monroe Aff. Exs. 2 (Adepoju Dep.) 13 (plaintiff's testimony that an agent wearing a World Airways uniform checked her in at the airport in New York), 3 (Shonaiya Dep.) 10-11 (plaintiff's testimony that she checked in at a counter identified by a World Airways sign at the airport in Lagos), 19 (Munson Dep.) 23-24 (testimony of World employee that World displayed signs with the World Airways logo at the airport in Lagos); but see id. at 25 (testimony of World employee that Ritetime maintained a ticket office "on the balcony level right above where we normally did check-in"); id. Ex. 15 (Aktabowski Dep.) 19-20 (testimony of World employee that passengers were met by employees of Ritetime at a "podium prior to the actual checkin counters" before checking in with World); Costello Aff. 22 (Nkwor Dep.) 18 (testimony of plaintiff that he saw no employees of World or Ritetime at the airport in Lagos). Several circuit courts have relied upon similar displays as evidence of apparent authority. Grajales-Romero, 194 F.3d at 293-94 (1st Cir. 1999) (finding reasonable jury's conclusion that apparent authority existed based in part on display of American Airlines logo at check-in counter); Wood

v. Holiday Inns, Inc., 508 F.2d 167, 176 (5th Cir. 1975) (finding that question of fact existed as to apparent authority where local inn alleged to be agent of national chain was contractually required to "use the same service marks and trademarks, and exterior and interior decor as the Holiday Inns owned by the parent company."); Gizzi v. Texaco, Inc., 437 F.2d 308, 310 (3d Cir. 1971) (finding that question of fact existed as to apparent authority based in part on local service station's prominent display of Texaco's insignia and slogan).

The evidence supporting plaintiffs' claim of apparent authority is insufficient to justify summary judgment for plaintiffs themselves. For example, plaintiffs have adduced evidence showing that World's logo was displayed in connection with the flight program, but they have not shown that more than a few affected passengers saw or relied upon such displays. Nevertheless, a question of fact exists as to whether World clothed Ritetime with apparent authority to contract on its behalf. The Court therefore declines to grant summary judgment for either party on this point. See Momen v. United States, 946 F. Supp. 196, 203-05 (N.D.N.Y. 1996) (whether regional airline was agent of national airline on basis of apparent authority was "a question of fact for the jury"); Shaw v. Delta Airlines, Inc., 798 F. Supp. 1453, 1459 (D. Nev. 1992) (summary judgment as to whether regional airline was agent of national airline on apparent authority theory was inappropriate where "there [we]re material facts in dispute").

Finally, the Court addresses plaintiffs' claim that even if Ritetime had neither actual nor apparent authority to contract on World's behalf, World ratified Ritetime's sale of plaintiffs' tickets. Pls.' Mem. 13-15. Ratification, under the law of New York, is "the affirmance by a party of a prior act that did not bind it at the time but that was done or purportedly done on its account." Chemical Bank v. Affiliated FM Ins. Co., 169 F.3d 121, 128 (2d Cir. 1999) (citing,

30

inter alia, Heinike, 83 A.D.2d at 752). See also Monarch Ins. Co. of Ohio v. Ins. Co. of Ireland Ltd., 835 F.2d 32, 36 (2d Cir. 1987) ("Ratification requires acceptance by the principal of the benefits of an agent's acts, with full knowledge of the facts, in circumstances indicating an intention to adopt the unauthorized arrangement."). Like the doctrine of apparent authority, that of ratification is "very closely associated with estoppel," though unlike estoppel, ratification does not require "a change of conduct by, or prejudice to, the innocent third party." Holm v. C.M.P. Sheet Metal, Inc., 89 A.D.2d 229, 232-33, 455 N.Y.S.2d 429, 432 (App. Div. 1982).

"Ratification 'must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language.'" Chemical Bank, 169 F.3d at 128 (quoting Holm, 89 A.D.2d at 233). But the required intent may be "implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence or where the effect of the contract depends upon future events." Id. (quoting Monarch Ins. Co., 835 F.2d at 36). Again, unless the relevant facts are undisputed, the question of ratification is one for the jury. Hedeman, 36 N.E.2d at 133. See also Transmarittima Sarda Italnavi Flotte Ruiniti S.p.A. v. Foremost Ins. Co., Inc., 482 F. Supp. 110, 116 (S.D.N.Y. 1979) ("Ordinarily the question whether a principal has ratified by acquiescence for an unreasonable time after being informed of the agent's unauthorized act is a question of fact for the jury.") (quoting Leviten v. Bickley Mandeville & Wimple, Inc., 35 F.2d 825 (2d Cir. 1929)).

As with apparent authority, summary judgment for either party on the question of ratification is inappropriate, since plaintiffs have adduced evidence sufficient to create a question

of fact, precluding summary judgment for World, but insufficient to warrant a grant of summary judgment in their own favor. Specifically, a question of fact exists as to whether World knew that Ritetime had sold tickets with 2004 return dates and flew passengers on the outbound legs of those flights in 2003, thus accepting the benefit of Ritetime's actions under circumstances indicating its own intent to adopt them.

World argues that it cannot have ratified Ritetime's sale of tickets for travel in 2004, since it "did not have full knowledge of the facts." Def.'s Mem. 15. It claims that it "did not have access to Ritetime's passenger database and did not even know who the passengers would be on any given flight until the day of the flight." Id. See Costello Aff. Ex. 25 (Munson Dep.) 118 (testimony of World employee that World received passenger manifests on the "same day usually."). Although it is clear that World's contractors collected the tickets of passengers participating in the Nigeria flight program, see Monroe Aff. Exs. 14 (Def.'s Response to Pls.' Requests for Admission) ¶¶ 67-70 (acknowledging that the contractors collected the tickets), 51 (Strickland Dep.) 61-62 (explaining that World hired the contractors), World claims there is no evidence to show that these "ticket handlers" were aware that some passengers' tickets bore 2004 return dates, Def.'s Mem. 15 n.18. See Def.'s Reply 19 ("[T]here is no evidence that World's agents had any responsibility for reviewing flight coupons other than for the flight for which a passenger was checking in . . . ."). Nevertheless, World has admitted that it was aware in "late December 2003" that Ritetime had sold tickets with 2004 dates, Def.'s Mem. 15, and it has not shown that it operated no flights after acquiring this knowledge. Moreover, even if neither World nor its contractors knew that World's passengers held tickets with 2004 return dates, World clearly was in a position to acquire such knowledge. See Harvey v. J.P. Morgan & Co.,

32

166 Misc. 455, 464, 2 N.Y.S.2d 520, 531 (Munic. Ct. Queens 1937) ("[H]aving once ratified its agents' acts, [a principal] cannot afterwards avoid the effect of such ratification by showing that it was not acquainted with all the facts of the transaction ratified, when it was always in a position and was in possession of means of learning them.").

World argues further that it "did not receive the benefits of any relevant transactions," since under the terms of the Charter Agreement, it "received fixed payments per-flight from Ritetime, which did not depend on the number of tickets sold." Def.'s Mem. 14. It notes, as well, that Ritetime was behind on its payments to World throughout the flight program. Id. at 15; see also Costello Aff. Ex. 5 (Duarte Dep.) 76 (testimony of World executive that Ritetime was in arrears "for most of the duration of the program."). However, the record suggests that World did indeed benefit from flying passengers whose tickets bore 2004 return dates, since to do otherwise would have meant alerting Obafemi and the public that World meant to halt operations, and such a disclosure likely would have hurt World financially. Alan Fort, World's vice president for passenger sales, acknowledged as much in his deposition testimony: "What we were trying to do was get as much money as we possibly could. Our indication at that point was that the [charter] agreement was not going to be able to be extended, but if we told [Ritetime] that the agreement wasn't going to get extended, then we weren't going to get another cent from [Obafemi]." Costello Aff. Ex. 74 (Fort Dep.) 120. See also Monroe Aff. Ex. 44 (email from Robert DuBois, World's sales director, to the United States ambassador to Nigeria, with handwritten note apparently from Alan Fort stating: "[The ambassador] needs to keep [the planned cessation of flights] confidential at this point—if word leaks we are out significant $$.").

World also contends that its actions did not indicate an "intent to adopt" Ritetime's sale

33

of tickets for travel in 2004. Def.'s Reply 20-21. But World's silence in the face of such sales, especially when coupled with its acceptance of tickets for the outbound legs of those flights, may indeed indicate such an intent. See Heinike, 83 A.D.2d at 752 ("[A]ffirmance may be inferred from silence when, in the normal course of affairs, one who does not wish to consent would speak out.") See also C.E. Towers Co. v. Trinidad & Tobago (BWIA Int'l) Airways Corp., 903 F. Supp. 515, 526 (S.D.N.Y. 1995) ("[R]atification can occur through the silence of the principal. When an act is done without authority, under an assumed agency, it is the duty of the principal to disavow and repudiate it in a reasonable time after information of the transaction if he would avoid responsibility thereof.") (internal quotation marks and citation omitted)); Harvey, 2 N.Y.S.2d at 531 ("The general doctrine that one may, by affirmative acts, and even by silence, ratify the acts of another who has assumed to act as his agent, is not disputed.") (citation and italics omitted).

World observes finally that because DOT had not authorized Ritetime and World to operate additional Nigeria flights in 2004, Ritetime's sale of tickets for such flights violated DOT regulations. Since Ritetime's actions were illegal, World argues, it cannot have ratified them. Def.'s Reply 7-8, 18 (citing Jaclyn, Inc. v. Edison Bros. Stores, Inc., 406 A.2d 474, 487, 170 N.J. Super. 334, 359 (Super. Ct. 1979) ("It is the settled law of both New York and New Jersey that an illegal act is incapable of being ratified.") (citing Babcock v. Warner Bros. Theatres, 240 A.D. 466, 270 N.Y.S. 765 (App. Div. 1934); Sirkin v. Fourteenth St. Store, 124 A.D. 384, 108 N.Y.S. 830 (App. Div. 1908))). Jaclyn, and the New York cases upon which it relies, concern principals whose agents engaged in bribery, and who invoked the rule relied upon here by World. In Jaclyn, a principal sought to rely on the fact that its agent had procured a contract through

34

bribery, with its knowledge and assent, as a means of escaping liability on that contract—a result the New Jersey court regarded as "unconscionable." 406 A.2d at 487. In Babcock, where the administrator of a principal's estate sought enforcement of a contract on the theory that the decedent had ratified it, a court of the Appellate Division explained that if the contract was secured through bribery, it was incapable of ratification. 240 A.D. at 470-71. And in Sirkin, another Appellate Division court held that a buyer who had bribed a seller's agent without the seller's knowledge or assent could not recover against the seller on a ratification theory. 124 A.D. at 388-91. All three cases are distinguishable, in that the party seeking enforcement here is not a participant in bribery or any other illegal act. Instead, enforcement is sought by innocent third parties: passengers who in good faith purchased tickets Ritetime had no legal authority to sell. More nearly on point, therefore, is Bankers Trust Company v. Litton Systems, Inc., in which the Second Circuit, distinguishing Sirkin, observed: "Where an innocent third party, such as a holder in due course, is suing upon an illegal contract, the policy argument [against enforcement of the contract] is inapplicable because the plaintiff has done no wrong for which it should be penalized." 599 F.2d 488, 492-93 (2d Cir. 1979). And further: "[I]nsofar as it is enforcing the rights of an innocent party, the court does not . . . participate in a wrong when it enforces an illegal contract." Id. at 493. Even where an agent procures a contract by means of fraud, New York law permits an innocent third party to invoke the principle of ratification against the principal. See also Adler v. Helman, 169 A.D.2d 925, 926, 564 N.Y.S.2d 828, 830 (App. Div. 1991) ("A principal is liable for the fraudulent acts of his agent committed within the scope of his authority, and if the agent acted outside the scope of his authority, the principal is nevertheless liable if he later ratifies the fraudulent acts and retains the benefits derived from

35

them."). The same approach is warranted here. Plaintiffs did no wrong in purchasing tickets for the Nigeria flight program and there is no public policy rationale for penalizing them. Plainly, World was aware that if Ritetime sold tickets for an unauthorized charter, it violated DOT regulations. To the extent that World afterward ratified Ritetime's illegal actions, it may not now avoid liability by pointing out that those actions were illegal.

In sum, as with apparent authority, the evidence adduced by plaintiffs on the question of ratification is sufficient to permit them to survive World's motion for summary judgment, but insufficient to warrant summary judgment in their favor. The Court therefore declines to grant summary judgment on this issue for either party.

## D.     The Airline Deregulation Act

World contends that plaintiffs' fraud and negligence claims are preempted not only by the Montreal Convention, but also by the Airline Deregulation Act of 1978 (the "ADA"), which provides that no state shall "enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1). The Supreme Court has interpreted the ADA as preempting "[s]tate enforcement actions having a connection with, or reference to, airline rates, routes, or services." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992) (internal quotation marks omitted). The Court also has limited the ADA's preemptive reach, however. See id. at 390 ("'[S]ome state actions may affect [airline rates, routes or services] in too tenuous, remote or peripheral a manner' to have a pre-emptive effect.") (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100 n.21 (1983)). Neither the Supreme Court nor the

Second Circuit has offered a per se rule with regard to the ADA's preemption of tort claims. See Abdu-Brisson v. Delta Air Lines, Inc., 128 F.3d 77, 81 (2d Cir. 1997) ("The Supreme Court has not drawn any distinct preemption lines for guidance, and that may not be possible."). Rather, the Second Circuit has explained that the ADA's preemption provision must be applied "on a case-by-case basis," and that state and local laws must "directly affect prices, routes or services" to be preempted. Id. at 86.

In Rombom v. United Air Lines, Inc., 867 F. Supp. 214, 221-22 (S.D.N.Y. 1994), a district court of this circuit developed a three-part test for determining whether tort claims are preempted by the ADA. Rombom involved a tort claim by passengers whom the defendant airline alleged had behaved disruptively prior to takeoff. The court held that the ADA would preempt their tort claims only if (1) "the activity at issue in the claim [was] an airline service"; (2) "the claim affect[ed] the airline service directly [rather than] tenuously, remotely, or peripherally"; and (3) "the underlying tortious conduct was reasonably necessary to the provision of the service." Id. Regarding the third prong, the court added that "where [a] service was provided in a manner that falls within a spectrum of reasonable conduct," preemption should occur, but the ADA should not be "construed in a manner that insulates air carriers from tort liability for injuries caused by outrageous conduct that goes beyond the scope of normal aircraft operations." Id. at 222. Applying this analysis, the court found that although the plaintiff's claims based on flight attendants' allegedly rude behavior and on the pilot's decision to return the airplane to the gate, rather than taking off, were preempted, her claim based on the flight crew's decision to have her arrested was not. The decision to remove a passenger might, under some circumstances, be a service, the court said, but because the plaintiff alleged that the decision was

motivated by "spite or some unlawful purpose," her claim was "at best tenuously related to an airline service." Id. at 224. Moreover, even if her claim had been directly related to the service, the decision to have her arrested, at least on her version of the facts, did not appear to have been reasonably necessary to protect the safety of the flight. Id. Although the Second Circuit has not explicitly adopted the Rombom approach, numerous district courts of this circuit have done so. See, e.g., Donkor v. British Airways Corp., 62 F. Supp. 2d 963, 972 & n.5 (E.D.N.Y. 1999); Peterson v. Cont'l Airlines, Inc., 970 F. Supp. 246, 250-51 (S.D.N.Y. 1997); Galbut v. Am. Airlines, Inc., 27 F. Supp. 2d 146, 152-53 (E.D.N.Y. 1997).

The Court finds the Rombom approach sensible, and applies it here. Plaintiffs' fraud claims are rooted in the allegation that defendants refused to fly ticketed passengers, and their negligence claims in defendants' allegedly negligent supervision of Ritetime. With regard to both types of claims, the Court finds that although the first two prongs of the Rombom test for preemption are satisfied, the third is not. Clearly, the carriage of ticketed passengers on international flights is an "airline service" under the ADA; the same reasonably could be said of contracting with another carrier to operate such flights. Likewise, claims based on an airline's decision to cancel passengers' flights, and claims based on an airline's selection and supervision of contractors, directly implicate the services at issue. See Rombom, 867 F. Supp. at 222 (citing Williams v. Express Airlines I, Inc., 825 F. Supp. 831, 833 (W.D. Tenn. 1993) (holding that claims stemming from an airline's *refusal* to seat a passenger directly implicate airline services because they 'immediately arise from the denial, or allegedly inadequate provision of, such services.'")). However, neither an airline's total and indefinite refusal to transport ticketed passengers, nor its selection of a contracting carrier that engages in the same conduct, is

"reasonably necessary to the provision" of the services just described. Nor does either action fall within "a spectrum of reasonable conduct." Id. at 222. The fraudulent and negligent conduct of which defendants are accused is better described as "outrageous." Id. Thus the ADA does not preempt plaintiffs' state law tort claims.

E.    **Supplemental Jurisdiction**

World's final argument is that if plaintiffs' federal claims are dismissed, the Court should decline to exercise jurisdiction over their state law claims. Under 28 U.S.C. § 1367(c)(3), a district court "*may* decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." (emphasis supplied). The Second Circuit has explained, "as a general proposition, that 'if [all] federal claims are dismissed *before trial* . . ., the state claims should be dismissed as well.'" Motorola Credit Corp. v. Uzan, 388 F.3d 39, 46-47 (2d Cir. 2004), cert. denied, 125 S. Ct. 2270 (2005) (quoting Castellano v. Bd. of Trustees, 937 F.2d 752, 758 (2d Cir. 1991)) (alterations and emphasis in original). But it has also held that "when the dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair. Nor is it by any means necessary." Id. at 47 (quoting Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir. 1994)) (internal quotation marks omitted). See also First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 183 (2d Cir. 2004) ("[T]he discretion implicit in the word 'may' in subdivision (c) of [28 U.S.C.] § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience,

and fairness to litigants.") (second alteration in original, citation omitted).

Here, the parties have been litigating in federal court for several years, and discovery has taken place. A dismissal on jurisdictional grounds at this juncture would frustrate the goals of judicial economy, convenience, and fairness. See Ametex Fabrics, Inc. v. Just In Materials, Inc., 140 F.3d 101, 105 (2d Cir. 1998) (holding that district court did not abuse its discretion in retaining jurisdiction over state law claims where parties had engaged in discovery and held a settlement conference); Purgess v. Sharrock, 33 F.3d 134, 138-39 (2d Cir. 1994) (holding that district court did not abuse its discretion in retaining jurisdiction over state law claims where federal claims were dismissed after the close of all evidence, noting that "several district courts in this circuit have exercised supplemental jurisdiction under less compelling circumstances," and collecting cases). Thus, although plaintiffs' federal claims are indeed dismissed, the Court retains jurisdiction over plaintiffs' claims under state law.

## CONCLUSION

For the foregoing reasons, World's motion for summary judgment is granted as to plaintiffs' claims for delay under the Montreal Convention, denied as to plaintiffs' claims for breach of contract, and denied as to plaintiffs' tort claims. Plaintiffs' cross-motion for summary judgment is denied. The Court retains jurisdiction over plaintiffs' state law claims.

SO ORDERED.

Dated: Brooklyn, New York
     October 25, 2007

s/ Judge Raymond J. Dearie
_____
RAYMOND L. DEARIE
United States District Judge